UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| STEPHEN P. CIOLINO,<br><br>　　　　　Plaintiff,<br>　v.<br><br>STATE OF NEVADA EX REL. et al,<br><br>　　　　　Defendants. | Case No. 2:23-cv-00030-ART-NJK<br><br>ORDER ON MOTION FOR SUMMARY JUDGMENT (ECF No. 101) AND RELATED MOTIONS (ECF Nos. 100, 102) |

Plaintiff Stephen P. Ciolino, an inmate currently incarcerated at Northern Nevada Correctional Center brings this civil rights action under 42 U.S.C. § 1983 for violations of his due process, First Amendment, and Eighth Amendment rights while housed at High Desert State Prison. (ECF No. 10.) Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 101.)

## I.    Legal Standard

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting or disputing a fact "must support the assertion by … citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder

1

could rely to find for the nonmoving party. *Id.*

In determining summary judgment, courts apply a burden-shifting analysis. A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case. *See id.* at 323-24. After the movant has met its burden, the burden shifts to the nonmovant to come forward with specific facts showing a genuine issue of material fact remains for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although "[o]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion," *id.* (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586-87 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. 242 at 252. In other words, the non-moving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Angel v. Seattle-First nat. Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)). Instead, to survive summary judgment, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial. *See Celotex Corp.*, 477 U.S. 317 at 324.

When a *pro se* litigant opposes summary judgment, his or her contentions in motions and pleadings may be considered as evidence to meet the non-party's

burden to the extent: (1) contents of the document are based on personal knowledge, (2) they set forth facts that would be admissible into evidence, and (3) the litigant attested under penalty of perjury that they were true and correct. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).

If the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, then the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson*, 477 U.S. 242 at 250. "If, as to any given material fact, evidence produced by the moving party... conflicts with evidence produced by the nonmoving party ... we must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact." *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). If reasonable minds could differ on material facts, summary judgment is inappropriate because summary judgment's purpose is to avoid unnecessary trials only when the material facts are undisputed; if not, the case must proceed to the trier of fact. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995) (citing *Lindahl v. Air France*, 930 F.2d 1434, 1436 (9th Cir. 1991)).

## II.   Analysis

### a.  Administrative Exhaustion

Defendants argue that Plaintiff failed to file any grievances that address his First Amendment claims, Eighth Amendment medical indifference claim, and Eighth Amendment conditions of confinement claim, and therefore they are all subject to dismissal. (ECF No. 101 at 14.) Defendants also contend that Plaintiff's Fourteenth Amendment due process and Eighth Amendment excessive force claims were not properly exhausted through the A.R. 740 process. (*Id.* at 15.) Plaintiff points to his Inmate Grievance History to show that he did file grievances for each of his claims, and any failure to exhaust was caused by the unavailability of the grievance process. (ECF No. 111 at 8-12.)

3

### i. NDOC Grievance Procedure

A.R. 740 governs the grievance process at NDOC institutions. Two versions of the regulation are relevant to Plaintiff in this case: the regulations effective on November 20, 2018, and the regulations effective on April 28, 2022. The Court cites to both versions. To properly exhaust their administrative remedies an inmate must grieve through all three levels: (1) Informal; (2) First Level; and (3) Second Level. (ECF 101-21 at 13-16); AR 740.08.10. First, the inmate must file an Informal Grievance within six months "if the issue involves personal property damage or loss, personal injury, medical claims, or any other tort claims, including civil rights claims." (ECF Nos. 101-20 at 11; 101-21 at 11); AR 740.08(4)(A). An inmate's failure to submit an Informal Grievance within this period "shall constitute abandonment of the offender's grievance at this and all subsequent levels." (ECF Nos. 101-20 at 12; 101-21 at 12); AR 740.08(8). NDOC staff are required to respond within 45 calendar days. (ECF Nos. 101-20 at 12; 101-21 at 13); AR 740.08(12). An inmate who is dissatisfied with the response to their Informal Grievance may appeal to the First Level within five calendar days. (ECF Nos. 101-20 at 12; 101-21 at 13); AR 740.08(12)(A).

This next grievance level is called a "First Level Grievance." (ECF Nos. 101-20 at 12; 101-21 at 13); AR 740.09. A First Level Grievance "should be reviewed, investigated, and responded to by the Warden at the institution where the incident ... occurred, even if the Warden is the subject of the grievance." (ECF Nos. 101-20 at 12; 101-21 at 13); AR 740.09(1). However, "[t]he Warden may utilize any staff in the development of a grievance response." (ECF Nos. 101-20 at 12; 101-21 at 13); AR 740.09(1)(A). The time limit for a response is 45 days. (ECF Nos. 101-20 at 14; 101-21 at 14); AR 740.09(6). Within five days of receiving a dissatisfactory response to the First Level Grievance, the inmate must then appeal to the next level, called the "Second Level Grievance." (ECF Nos. 101-20 at 14; 101-21 at 15); AR 740.09(6)(A).

Officials must respond to a Second Level Grievance within 60 days and specify "the decision and the reasons for the decision." (ECF Nos. 101-20 at 15; 101-21 at 15-16); AR 740.10(3), (5). Once the inmate receives a decision there are no further steps and the inmate is considered to have exhausted their available administrative remedies. (ECF 101-21 at 13-16); AR 740.08.10.

Starting April 28, 2022, if prison staff fail to respond within the prescribed 60-day period, the inmate must submit an Offender Request Form. (ECF No. 101-21 at 15-16); AR 740.10(4). The official then has an additional 60 days to either respond to the Offender Request Form or the underlying grievance itself. (ECF No. 101-21 at 15-16); AR 740.10(4). If the official fails to do so "the offender will have exhausted the administrative remedy process." (ECF No. 101-21 at 15-16); AR 740.10(4). The official may also inform the inmate more time is needed in response to the Offender Request Form. (ECF No. 101-21 at 15-16); AR 740.10(4). In such cases the official must provide the inmate with "a timeframe in which a response will be provided." (ECF No. 101-21 at 15-16); AR 740.10(4). If the official fails to meet that timeline "the grievance process will be considered exhausted." (ECF No. 101-21 at 15-16); AR 740.10(4). Once a grievance is exhausted the inmate may then pursue civil litigation in federal court.

Inmates are required to follow proper procedure throughout the grievance process, and failure to do so may cause the inmate's grievance to be rejected. (ECF Nos. 101-20 at 4, 101-21 at 4); AR 740.03(1). For example, a grievance which "does not factually demonstrate a loss or harm and does not state the action or remedy that will satisfy the claim" is deficient and will be returned "with an explanation as to what was missing for the grievance to be processed." (ECF Nos. 101-20 at 4, 101-21 at 4); AR 740.03(1). As of April 2022, the inmate must correct the issues identified by the official and resubmit their grievance at the same level. (ECF Nos. 101-21 at 4); AR 740.03(6). Before 2022, AR 740 did not require an inmate to correct errors and resubmit. (ECF No. 101-20 at 5); AR

740.03(5).

Additionally, an official's failure to respond within the prescribed timeframes at each level "is not an automatic finding for the offender." (ECF Nos. 101-20 at 6; AR 740.03(8); 101-21 at 6, AR 740.03(9)). Rather, when a response is overdue the inmate can "proceed to the next grievance level" or "wait[ ] for the response before initiating the appeal." (ECF Nos 101-20 at 6; 101-21 at 6); AR 740.03(9)(B), (C). If the inmate chooses to wait for a response the official's delay "does not count against the offender's timeframe for an appeal." (ECF Nos 101-20 at 6; 101-21 at 6); AR 740.03(9)(C). Thus, even if an inmate's Informal or First Level grievance is not responded to within the prescribed time limits, the inmate is still required to proceed through the grievance process outlined above to fully exhaust their claim.

### ii.  PLRA and Administrative Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

"[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). "[A] prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court[.]" *Id.* at 88. But, because the PLRA requires exhaustion of those administrative remedies "as are available," the PLRA does not require exhaustion when circumstances render administrative remedies "effectively unavailable." *See Sapp v. Kimbrell*, 623 F.3d 813, 822-23 (9th Cir. 2010). In *Ross v. Blake*, the Supreme Court provided a non-exhaustive list of circumstances where administrative remedies were not capable of use: (1) where the procedure "operates as a simple dead end" because officers are "unable or consistently unwilling to provide any relief to

6

aggrieved inmates"; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use" because "no ordinary prisoner can discern or navigate it"; and (3) when prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." 578 U.S. 632, 642-44.

The Ninth Circuit has held "that where prison officials declined to reach the merits of a particular grievance for reasons inconsistent with or unsupported by applicable regulations, administrative remedies were effectively unavailable." *Albino v. Baca*, 747 F.3d at 1173 (citing *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010). And as this Court has previously noted, "the intent of the exhaustion requirement is to place the facility on notice of issues raised by an inmate and not erect esoteric and irrelevant procedural requirements." *Williams v. Allen*, No. 2:17-cv-01612-RFB-DJA, 2020 WL 2798009 *7 (D. Nev. May 29, 2020); *see also Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) ("The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation.").

Failure to exhaust administrative remedies is a non-jurisdictional affirmative defense that defendants must raise and prove. *See Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014); *Jones v. Bock*, 549 U.S. 199, 212-17 (2007). A "defendant must first prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy. ... Then, the burden shifts to the plaintiff, who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. ... The ultimate burden of proof, however, remains with the defendants." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015).

"If undisputed evidence viewed in the light most favorable to the prisoner

shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Albino*, 747 F.3d at 1166.

### iii. First Amendment Free Exercise and RLUIPA

Defendants argue that Plaintiff did not file a grievance regarding his allegation that Defendants Johnson, Bean, Barrett, Moka, and Quinn purposefully moved him to a housing unit with no access to the chapel, burdening his practice of religion for six months. (ECF No. 101 at 14.) Upon reviewing Plaintiff's Inmate Grievance History, the Court agrees.

Plaintiff does not point the Court to a specific grievance focused on his First Amendment rights. In grievance number 20063140454, Plaintiff argues that his transfer to the Security Monitoring Unit ("SMU") without a hearing deprived him of his ability to access the chapel. (ECF No. 111-3 at 84.) This grievance is focused on the lack of process that Plaintiff received before moving into a more restrictive housing unit, and further, Plaintiff does not argue that he exhausted First Amendment or RLIUPA claims in his Opposition to the Motion for Summary Judgment. (ECF No. 111.) He also does not argue that the grievance process was unavailable to him such that he was prevented from filing a specific grievance. Therefore, summary judgment is granted regarding Plaintiff's claims under the First Amendment and RLIUPA.

### iv. Eighth Amendment Medical Deliberate Indifference

Defendants argue that Plaintiff did not a file a grievance regarding his allegation that after being forced to clean a cell covered in feces in March 2022, Plaintiff contracted a fungal infection and did not receive treatment for nearly a year. (ECF No. 101 at 14.) Upon reviewing the Inmate Grievance History, the Court agrees. Plaintiff did file kites regarding the infection. (ECF No. 111-4 at 14, 16, 18. 20.) A kite is not a grievance through which Plaintiff could exhaust his

administrative remedies. *Walker v. Allen*, No. 2:19-cv-01587-JAD-NJK, 2022 WL 612659, at *6 (D. Nev. Mar. 1, 2022) (citing *Green v. Lindberg*, No. 78002-COA, 2020 WL 3568653, at *2 (Nev. App. Jun. 30, 2020) (distinguishing between kites and grievances)). Plaintiff argues that Defendants engaged in the spoliation of medical documents, because Defendants deny having received his kites and have no record of his complaints. (ECF No. 101 at 27; 101-14 at 3.) Because Plaintiff does not argue that Defendants spoliated evidence of a grievance regarding the infection, this claim is still unexhausted.

Plaintiff argues that the grievance process was unavailable, and therefore he was not able to exhaust his claims before suing. (ECF No. 111 at 10.) His arguments focus on rejections to existing grievances. He does not argue that the grievance process was wholly unavailable to him in such a way that would prevent him from filing a grievance in the first place.

Therefore, summary judgment is granted regarding Plaintiff's deliberate indifference claim related to the treatment of his fungal infection.

### v. Eighth Amendment Conditions of Confinement

Defendants argue that Plaintiff did not file a grievance related to his allegation that he was denied outdoor exercise while he was housed in SMU. (ECF No. 101 at 14.) Plaintiff points to grievance 20063128124, describing a denial of yard access from September 6, 2021. (ECF No. 111-3 at 99.) Defendants respond that the grievance to which Plaintiff cites is regarding decisions made by Defendant Johnson, against whom Plaintiff's claims were dismissed at screening. (ECF No. 116 at 2.) The Court agrees. The screening order found that Defendant Johnson's order withholding yard time was a temporary denial of outdoor exercise with no medical effects per *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997), and dismissed the claim. (ECF No. 12 at 10.) Grievance number 20063140454, filed July 14, 2022, complains about a deprivation of due process that resulted in the loss of yard time caused by Plaintiff's transfer to SMU without a hearing.

(ECF No. 111-3 at 83-84.) Plaintiff does not point to, and the Court cannot find, any other grievances that address allegations that Defendant Bean denied Plaintiff outdoor time for ninety days in June 2022 while outdoor cages were constructed in the yard.

Because Plaintiff did not file any grievance regarding Defendant Bean's denial of yard time he cannot excuse his lack of exhaustion via unavailability. Therefore, summary judgment is granted as to Plaintiff's condition of confinement claim.

### vi. Fourteenth Amendment Intentional Deprivation of Property

Defendants argue that Plaintiff has not exhausted his intentional deprivation of property claim against Defendants Moka, Quinn, Garcia, and Smith for allegedly taking and destroying his property during a cell search on February 27, 2022, because his grievances failed to follow A.R. 740's procedural rules. (ECF No. 101 at 15.) Plaintiff grieved the loss of his property from the February 27, 2022, cell search three times: on March 6, 2022 (grievance number 20062136481), March 27, 2022 (grievance number 20063136534), and May 22, 2022 (grievance number 20063137794). (ECF No. 101-16 at 7, 11-13.)

Defendants allege that grievance 20062136481 was submitted with four different issues and two separate property claim forms in violation of A.R. 740.03(4)(D), an abuse of the grievance process. (*Id.*) They also allege that grievance number 20063137794 was never appealed by Plaintiff after being denied and was therefore abandoned. (*Id.*) Grievance number 20063136534 (ECF No. 111-3 at 64-81), which Plaintiff attached to his opposition, Defendants allege was properly rejected three times and never addressed on the merits pursuant to A.R. 740.08(4)(D)(5). (ECF No. 116 at 4.)

Plaintiff alleges that the Improper Grievance Memorandum in each of these cases requested documents already within the Defendants' possession and were

therefore improperly screened. (ECF No. 111 at 9-10.) Plaintiff argues that although Defendants could make their own copies of documents, it put Plaintiff in the position of needing to send a copy request to the Law Library, which would mean he would inevitably not meet the A.R. 740 five-day response deadline. (*Id.* at 11.)

He also contends that repeated procedural rejections indicate an effort by prison administrators to thwart inmates from taking advantage of the grievance process through machination, misrepresentation, or intimidation under *Ross v. Blake*, 578 U.S. 632 (2016). (*Id.* at 9.)

### 1. Grievance Number 20062136481

Plaintiff filed grievance number 200621336481 on March 6, 2022. (ECF No. 101-17 at 2.) It was rejected at the informal level on April 14, 2022, for including more than one appropriate issue and failing to attach all documentation and factual allegations, "i.e. Property Transfer Sheets, Canteen Receipts, Unauthorized Property Form, DOC 3026 Inmate Property Claim Form and Proof of continuous ownership receipts must be included" citing AR 740.08(5). (ECF No. 101-17 at 12.) In their motion, Defendants claim that these defects are legitimate examples of an abuse of the grievance process under A.R. 740.04(2)(E), and that Plaintiff failed to resubmit the grievance after curing the defects. (ECF No. 101 at 15.) Plaintiff argues that the grievance process was unavailable to him because it was rejected for failing to attach documents that were already in Defendants' possession. (ECF No. 111 at 9.) He does not dispute that the grievance was also rejected for including more than one issue.

Examining the grievance documents provided by Defendants, Plaintiff submitted an informal grievance form, an inmate personal property claim form, and an administrative claim form. (*See* ECF No. 101-17.) It does not say that Plaintiff improperly included two property claim forms nor that this would be disqualifying; and neither does A.R. 704.04.(2)(E). (*See* ECF No. 101-20 at 11.)

Similarly, A.R. 704.08(4)(D)(5) would not put him on notice that he needed to attach each of the listed documents. (ECF No. 101-16 at 12.) This is not a proper reason to screen Plaintiff's informal grievance, since it is inconsistent with or unsupported by applicable regulations. *See Mayo v. Williams*, No. 2:16-cv-00047-APG-VCF, 2016 WL 5867419, at *3 (D. Nev. Oct. 6, 2016) (grievance not properly rejected where regulation does not specify the documents that the inmate needs to attach); *Sapp*, 623 F.3d at 823.

Defendants' second reason for denying the grievance is legitimate. In the grievance, Plaintiff claims that his property was taken without authorization and adds that "included in this claim is a 1st Amendment Retaliation Issue[] . . . and direct links to my Religious freedom Issues." (ECF No. 101-17 at 3.) A.R. 740.03(4)(D) states that "[t]he inclusion of more than one grievance issue per form will be cause for the grievance to not be accepted." (ECF No. 101-20 at 5.) Thus, the grievance was properly screened under the available regulations. Plaintiff did not resubmit grievance number 200621336481 curing the alleged defects despite specific instructions.

Therefore, this grievance does not exhaust Plaintiff's claim for intentional deprivation of property.

### 2. Grievance Number 200631336534

On March 27, 2022, Plaintiff submitted grievance number 200631336534 on the same alleged search and unauthorized confiscation of his property, before he had the opportunity to hear back from Defendants on grievance 200621336481 above. (ECF No. 101-16 at 11.) It was also rejected on April 14, 2022, for requesting compensation of more than $500 and failing to attach all previously submitted grievances and proof of ownership. (ECF No. 111-3 at 76.) Plaintiff resubmitted the grievance on April 21, 2022, and was rejected for "fail[ing] to attach all previously submitted grievances" and "fail[ing] to attach

your Informal Level golden rod copy" on May 6, 2022. (ECF No. 101-16 at 11.[1]) (*Id.*) Plaintiff resubmitted the grievance again on May 8, 2022, was rejected for requesting compensation of more than $500, and notified he could no longer resubmit the grievance on May 19, 2022. (ECF No. 111-3 at 65.)

Defendants argue that these were all valid rejection notices with specifically identified listed defects that Plaintiff failed to cure. (ECF No. 116 at 4-5.) Plaintiff argues that Defendants were "unwilling to allow a process for exhaustion" since the prison already had access to documents that indicated proof of ownership in his inmate records. (ECF No. 111 at 10.) Plaintiff does not dispute that he twice requested remedies that exceeded the $500 limit set by A.R. 740.05(4).

As described above, failing to resubmit the copies of a previously rejected informal grievance is not a proper reason to screen an informal grievance. *See Mayo*, 2016 WL 5867419 at *3 (citing *Vela v. Cox*, No. 3:13–CV–00227–RCJ–VPC, 2014 WL 2921828, at *6 (D. Nev. June 26, 2014) ("[N]owhere in AR 740 is it specified that the inmate must submit his previous level grievance at the next level of review.")).

Defendants' second reason for denying the grievance is legitimate. Plaintiff requested more than $500 in his first informal grievance on March 27, 2022, and in his third attempt on May 8, 2022. (ECF No. 111-3 at 80, 70.) A.R. 740.05(4) clearly states that "compensation . . . arising out of a tort shall not exceed $500." At least one other court in this district has found that failure to correct an improper monetary remedy request does not make the grievance process unavailable, because a plaintiff "could and should have cured" the deficiency by

---

[1] Three of the documents within ECF No. 111-3, including references to grievance number 20063133654, provided by Plaintiff are not readable. (ECF No. 111-3 at 69, 72, 73.) One page refers to a second level rejection of a grievance number not relevant to this litigation. (*Id.* at 67.) The Court refers to the Inmate Grievance History provided by Defendants to understand their responses. (ECF No. 101-16 at 11.)

resubmitting them with a remedy amount within the cap and then request more in compensatory damages once they make it to federal court. *Miller v. Daniels*, No. 2:23-cv-00764-JAD-DJA, 2025 WL 2687171, at *3 (D. Nev. Sept. 19, 2025). Because Plaintiff was told that the remedy he requested must be under $500 after his first informal grievance was denied, he was aware of the rule and should have cured the deficiency.

Therefore, the grievance process was not made unavailable to Plaintiff, and he failed to fully exhaust grievance 20063136534.

### 3. Grievance Number 200631337794

On May 22, 2022, filed grievance number 200631337794 accusing Defendant Moka of stealing his property in retaliation for Plaintiff's previous complaints against him. (ECF No. 101-16 at 7.) The informal grievance was denied because his factual allegations were found "not credible" and therefore his complaint would not be forwarded to investigators. (ECF No. 101-16 at 7.) Plaintiff did not receive notice of the denial under December 23, 2022. (ECF No. 101-16 at 7.) Defendants claim that Plaintiff was "explicitly advised" to file a first level appeal in the denial of his informal level grievance. (ECF No. 101 at 15.) Examining the records provided of the grievance (ECF No. 101-18) and the Inmate Grievance History (ECF No. 101-16 at 7), there is no indication that Plaintiff was so advised. Plaintiff, however, does not dispute that this grievance was unexhausted in his Opposition.

Because none of the grievances that Plaintiff filed related to his intentional deprivation of property claim were properly exhausted, summary judgment is granted regarding his Fourteenth Amendment claim.

### vii. Eighth Amendment Excessive Force

Defendants argue that Plaintiff has not exhausted his excessive force claim against Defendant Rosses for allegedly donkey-kicking his cell door thirty times and causing hearing damage because Plaintiff failed to resubmit his first level

grievance for grievance number 20063136944. (ECF No. 101 at 15.) Plaintiff argues that this grievance was also denied under the auspices of failing to provide a form that was already in the Defendants' possession, making exhaustion unavailable. (ECF No. 111 at 9.)

Grievance number 20063136944 was filed as an informal grievance on April 6, 2022. (ECF No. 101-16 at 10.) When Defendants failed to respond to Plaintiff's informal grievance within forty-five days, Plaintiff escalated to a first level grievance, filed June 6, 2022. (*Id. see* ECF No. 101-21 at 11, A.R. 740.08(12) "The time limit for a response to the Informal Grievance is 45-calendar days from the date the grievance is received . . .") When a response is overdue, an inmate may proceed to the next grievance level. (ECF No. 101-21 at 6, A.R. 740.03(9)(B).) In his first-level grievance, Plaintiff states that Defendants "have all documentation as AR 740.02.01 states." (ECF No. 111-4 at 7; ECF No. 101-21 at 4, AR 740.02(1) "[g]rievance documents shall be stored at the facility and/or institution where the grievance was issued. The result of the grievance shall be input into NOTIS.")

On July 12, 2022, Defendants returned both Plaintiff's informal and first-level grievance; his first-level grievance was denied for not providing Plaintiff's copy of the informal grievance, despite Defendants still having a copy of Plaintiff's informal grievance in their possession. (ECF No. 101-16 at 10.) Plaintiff did not attempt to resubmit his first-level grievance with a copy of his informal grievance once it was returned, although he acknowledged receipt and disagreement with the outcome on August 8, 2022. (*Id.*)

Plaintiff argues that the grievance process was unavailable to him because he was put in "an endless cycle of start and repeat" (ECF No. 111 at 7) and the request for documents already in Defendants' possession made the process "incapable of use." (ECF No. 111 at 10). Plaintiff does not describe why he failed to refile his first-level grievance after acknowledging the Defendants' response.

Unlike grievance 200631336534, Plaintiff was not told that he could not file an amended grievance based on his same complaint. *See Kelley v. Gedney*, No. 3:16-cv-00041-MMD-WGC, 2017 WL 3477741 at *5 (D. Nev. 2017) (where Plaintiff has not shown that he cannot pursue the necessary sequence of appeals and was given proper instructions to do so despite an initial improper screening, exhaustion is not unavailable.)

Therefore, the grievance process was not unavailable to him, and he has not exhausted his claim for excessive force.

### b. Fourteenth Amendment Procedural Due Process Claim

In his Due Process Claim, Plaintiff claims that he spent seven months in SMU, a restrictive housing placement, without due process. Defendants do not dispute that Plaintiff exhausted his Fourteenth Amendment procedural due process claim and therefore turn to the defense of qualified immunity. (ECF No. 101 at 19.) (ECF No. 101 at 20-21.) Defendants argue that Plaintiff cannot prove that Defendants Barrett, Johnson, Barth, and Moreda participated in any of the decisions changing Plaintiff's housing or status, nor that Plaintiff suffered any constitutional violation in being briefly moved to "red tag" (administrative segregation) status for several days and then to SMU. (ECF No. 101 at 16-22.) Defendants further assert they are entitled to qualified immunity.

To state a claim for deprivation of procedural due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. *Sandin v. Conner*, 515 U.S. 472, 487 (1995). The Due Process Clause does not create a liberty interest related to prison officials' actions that fall within "the normal limits or range of custody which the conviction has authorized the State to impose." *Id.* at 478. State law may also create liberty interests. In *Sandin v. Conner*, the Supreme Court held that a prisoner has a liberty interest when confinement "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Subjecting a prisoner

16

to administrative segregation may not implicate due process because it is "within the expected perimeters of the sentence imposed." *Id.* at 485.

No matter how a prisoner's segregation (or other deprivation) is labeled by the prison or characterized by the prisoner, a court must examine the substance of the alleged deprivation and determine whether it constitutes an atypical and significant hardship." *Hernandez v. Cox*, 989 F. Supp. 2d 1-62, 1068-69 (D. Nev. 2013) (finding that there is no difference in analysis between administrative or disciplinary segregation). Factors for an atypical and significant hardship include "(1) the extent of difference between segregation and general population; (2) the duration of confinement; and (3) whether the sanction extends the length of the prisoner's sentence." *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing and discussing *Sandin*, 515 U.S. at 486–87)). Typically, "administrative segregation in and of itself does not implicate a protected liberty interest" under *Sandin. Id.*

### i. Personal Participation

Section 1983 liability attaches only upon personal participation by a defendant in a constitutional violation. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). A defendant personally participated in a deprivation "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir. 2012). Denial of a grievance is insufficient to establish personal participation for a section 1983 claim absent a showing that their individual actions violated the Constitution. *See May v. Williams*, No. 2:10-cv-00576-GMN-LRL, 2012 WL 1155390, at *3 (D. Nev. Apr. 4, 2012); *Gates v. LeGrand*, No. 3:16-cv-00321-MMD-CLB, 2020 WL 3867200, at *5 (D. Nev. Mar. 27, 2020).

In addition to arguing that Plaintiff suffered no constitutional violation, Defendants Barrett, Barth, Johnson, and Moreda contend that they cannot be

held liable because they did not personally participate in the recommendation that Plaintiff be placed in "red tag" status or in SMU, either at the June 10, 2022 in absentia hearing or the sub-classification review on June 14, 2022, that kept Plaintiff in SMU. (ECF No. 101 at 20.) Plaintiff argues that it is the responsibility of all Defendants to comply with procedures regarding disciplinary segregation pursuant to AR 733, and therefore all Defendants "that are not medical" had a duty to ensure he was not housed in SMU without due process. (ECF No. 111 at 15-16.) This includes the prolongation of his time in SMU due to delayed disciplinary hearings. *(Id.* at 14.) The Court addresses in turn Plaintiff's brief "red tag" status and the seven months he spent in SMU status.

### 1. Placement into "Red Tag" Status February 2022

Plaintiff alleges that he was improperly returned to "red tag" status an altercation with staff on February 28, 2022. (ECF No. 12-1 at 6.) The Court finds that no named Defendants personally participated in this decision, and regardless, whether Plaintiff's classification in "red tag" status was for two days or four days, he did not suffer an atypical and significant hardship sufficient to state a claim for a violation of due process.

On February 27, 2022, Plaintiff was issued an Offense in Custody ("OIC") for a fight with another inmate and moved to unit 12A under "red tag" status. ("the fight (OIC 505729)"). (ECF No. 10 at 2; ECF No. 101 at 2.) Before the incident, Plaintiff was classified as close custody and housed in Level 2 protective housing unit 12C. (ECF No. 101 at 2.) Level 2 protective status is the most restrictive level at HDSP. (ECF No. 111-4 at 57, OP 516.01(3).) "Red tag" status is a substitute for administrative segregation where an inmate stays in their regularly assigned cell subject to segregated housing restrictions. (ECF No. 101 at 2.)

The next day, Plaintiff attended a classification hearing where he was told he would return to Level 2 status pending the outcome of the OIC. (ECF No. 111-

3 at 6.) When he was returned to unit 12C, he got into an altercation with correctional officers because he found personal property was missing from his cell. (ECF No. 101-8 at 2.) Instead of allowing Plaintiff to stay in unit 12C, Correctional Officer Rosses placed Plaintiff back in unit 12A until March 3, 2022, when he was moved to cell 11E and undisputedly back at Level 2 status (*Id*; ECF No. 101 at 3; ECF No. 10 at 6.) The parties dispute whether Plaintiff's classification changed back to "red tag" or stayed at Level 2 when he was moved back to unit 12A. Besides the Notice of Charges from Correctional Officer Rosses, neither party identifies a named Defendant that played a role in the decision to move Plaintiff back to unit 12C for three more days.

Regardless of who may have participated in Plaintiff's return to cell 12A, however, there is no genuine dispute of material fact regarding a violation of Plaintiff's due process. Plaintiff did not suffer an atypical and significant hardship by being placed in administrative segregation, whether he was there for four days or two days. (ECF No. 101 at 2-3; ECF No. 111 at 15); *see Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) (sixteen days in administrative segregation is insufficient to state an atypical and significant hardship.) Therefore, summary judgment is granted to Defendants so far as Plaintiff alleges that his placement back in unit 12A violated his rights to due process.

### 2. Placement into Special Management Unit June 2022

Plaintiff claims that his placement in SMU following an in-absentia classification hearing violated his right to due process. (ECF No. 111 at 16.) Although none of the named Defendants directly participated in that hearing, Plaintiff alleges that "all persons named as defendants that are not medical had a duty not to classify Ciolino in SMU . . . or make sure no one did," citing to OP 516. (*Id*.) OP 516 states that the Warden "has overall responsibility for overseeing the administration" of the level system procedure, and that the Associate Warden "ensure[s] compliance" with the procedure. (ECF No. 111-4 at 56.) Therefore, the

Court construes Plaintiff's argument as one claiming that Defendant Warden Calvin Johnson personally participated in the alleged deprivation as the individual responsible for overseeing the classification system.

"A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under [§]1983." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution").

On June 10, 2022, Plaintiff was transferred to the special management unit ("SMU") after a full classification hearing.[2] (ECF No. 101 at 3; ECF No. 10 at 6; ECF No. 111-3 at 7 ("Case Note Printout Report").) Plaintiff was not in attendance at the hearing. (ECF No. 111-3 at 7.) Institutional classification may be conducted in-absentia if the proposed change is minor, not adverse, security precludes the inmate's presence, inmate waives presence, or if another reason is noted in the classification entry. (ECF No. 111-4 at 65, OP 506.02(5)(A)-(E).) The Case Printout Report does not explain why the hearing was conducted in-absentia. There is a dispute of fact as to whether Plaintiff was level-reduced when he was moved into SMU.

Defendants offer documentation that Caseworker III Kuloloia, Caseworker Warner, and Senior Correctional Officer Martinez, in coordination with the Offender Management Division ("OMD"), recommended that Plaintiff be transferred on the basis of his three pending disciplinary actions he had at the

---

[2] Plaintiff disputes that he had a hearing but attached an exhibit (ECF No. 111-3 at 7 "Case Note Printout Report") where he highlights that there was a full classification hearing, only that he was not present.

time. (ECF No. 101 at 3; 111-3 at 7.) Defendants Barrett, Barth, and Moreda are not listed as participating in that hearing. (*Id.*)

Although Defendant Warden Calvin Johnson did not participate in the classification hearing that Plaintiff alleges violated his rights to due process, Plaintiff argues that Defendant Johnson oversaw the choice to send him to SMU, and that he kited Defendant Johnson about being placed in SMU without a finding of guilt without a response. (ECF No. 111 at 17; ECF No. 111-5 at 62-63.) Defendant Johnson denies this in his RFAs. (ECF No. 111-5 at 63.) Construing the facts in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Defendant Johnson knew of an alleged violation of Plaintiff's rights and failed to prevent it.

### 3. Prolongation of SMU Status Due to Disciplinary Hearings

Plaintiff also argues that his stay in SMU was prolonged by Defendants Barth, Moreda, and Barrett because of their months-long failure to schedule and resolve his disciplinary hearings. (ECF No. 12-1 at 7). Defendants Barth and Moreda were lieutenants at HDSP responsible for scheduling the disciplinary hearings when Plaintiff was transferred to SMU, and Defendant Moreda presided over Plaintiff's disciplinary hearings in November 2022. (ECF No. 10 at 7.) Defendant Barrett was a Caseworker III at HDSP when Plaintiff was transferred to SMU. Plaintiff alleges that Defendant Barrett is responsible for ensuring inmates receive a hearing or an outcome in the disciplinary process. (ECF No. 10 at 7.)

Plaintiff was given his Notice of Charges on February 27 and 28, 2022 for the fight (OIC 505729) and the altercation with correctional officers (OIC 505789). (ECF No. 111-4 at 48, 51.) Defendant Barrett claims in a declaration that Plaintiff had a probable cause hearing on the charge regarding the altercation (OIC 505789) on March 13, but neither party provides additional evidence that

21

occurred. (ECF No. 111-5 at 78.) Plaintiff had his first recorded disciplinary hearings in front of Defendant Moreda on August 7, 2022. (ECF No. 111-4 at 48, 51.) Defendant Barth was also on the full classification committee on September 29, 2022, regarding Plaintiff's transfer to NNCC. (ECF No. 111-3 at 7.)

Plaintiff kited Defendants Barth and Moreda in November 2022 requesting the conclusion of those hearings (ECF No. 111-4 at 42, 44), and within days of sending those kites the hearings were held, with Defendant Moreda presiding (*Id.* at 48, 51). Defendant Barth later signed his name to the Informal Grievance Memo dated November 29, 2022, denying Plaintiff's July 14 grievance for his placement in SMU. (ECF No. 111-3 at 87.)

Defendants Barth and Moreda clearly had a role and knowledge of both Plaintiff's disciplinary proceedings and his ongoing classification and transfer into SMU. If they were not already aware, Plaintiff let them know through kites and grievances that he was still in SMU because of his pending charges. There is a genuine dispute of material fact as to Defendants Barth and Moreda's personal participation in Plaintiff's prolonged stay in SMU, because there is evidence they "set[] in motion a series of acts by other which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978.)

Plaintiff claims he wrote to Defendant Barrett to complete his disciplinary hearings after ninety days had passed since his Notice of Charges, but he does not attach an inmate request form to his Opposition. (ECF No. 10 at 6.) Construing the facts in a light most favorable to Plaintiff, a reasonable jury could find that Defendant Barrett also played a role in Plaintiff's prolonged placement in SMU.

### ii.  Violation of Due Process

Because a reasonable jury could find that Defendants Barth, Moreda, and Barrett personally participated in the decisions that led Plaintiff to be housed in

SMU for more than six months, the Court analyzes whether his rights to due process were violated. Plaintiff argues that he had a liberty interest in remaining in Level 2 housing, and that the delay of the resolution of his disciplinary charges unnecessarily prolonged the deprivation.

### 1. Atypical and Significant Hardship

Plaintiff argues that as a result of the placement in SMU for several months, he lost access time outside of his cell and in the yard as well as in-person chapel services and law library time, posing an atypical and significant hardship compared to his status in Level 2. (ECF No. 10 at 7.)

OP 507A, published September 22, 2020, governing SMU describes its purpose as establishing guidelines for the "Level Four Special Management/Transition Housing Unit." (ECF No. 111-3 at 18.) SMU is "the most restrictive General Population Housing Unit. Inmates housed in this unit require security above that of Level Three General Population inmates." (*Id.*) According to a declaration by Joshua Padilla, HDSP did not house Level 3 inmates at the time that Plaintiff was incarcerated there. (ECF No. 101-6 at 3.) Under "definitions," it states that "inmates completing Disciplinary Segregation (DS) or Disciplinary Detention (DD) may be placed in SMU housing based on the recommendation of the classification committee." (ECF No. 111-3 at 19.)

The parties dispute whether SMU is categorized as "segregation" at HDSP, and whether it indicated the Plaintiff was level-reduced. Defendants claim SMU is a "new designation for protective house offenders . . . created to provide offenders with a detour that allowed them to stay at HDSP and avoid being level reduced or classified to a maximum-security placement." (ECF No. 101 at 3.) According to a declaration by Donald Southworth, a designation is distinct and separate from a classification. (ECF No. 101-5 at 4.) He states that Plaintiff could have been level reduced and transferred to administrative segregation while his OIC charges were pending but was not. (ECF No. 101-5 at 4.) Plaintiff disputes

this finding and claims that SMU "is a continued segregated housing for inmates who had an administrative process and were found guilty of an infraction, received a set amount of time in disciplinary segregation ("D/S"), and were then given a choice to transfer from D/S to SMU after another process – full classification." (ECF No. 111 at 16.)

Courts in the District of Nevada have found that being placed in conditions that mirror administrative segregation can arguably pose an atypical and significant hardship. *See Burns v. Cox,* No. 3:18-cv-00231-MMD-WGC, 2020 WL 3549845 at *5 (D. Nev. June 8, 2020), *report and recommendation adopted*, No. 3:18-cv-00231-MMD-WGC, 2020 WL 3546852 (D. Nev. June 29, 2020) (genuine dispute of material fact as to atypical and significant hardship where plaintiff was moved to a more restrictive close custody unit for 110 days); *Augborne v. Filson*, No. 2:19-cv-00447-JAD-VCF, 2022 WL 3159322, at *3 (D. Nev. Aug. 8, 2022).

Although Defendants maintain that Plaintiff's custody level remained the same, Plaintiff states that he had conditions in SMU that mirrored administrated segregation. *See Burns*, 2020 WL 3549845, at *5. Like disciplinary segregation, his unit was allowed only one hour a week of yard time, and five hours a week of tier time. (ECF No. 111-3 at 27, 28.) Plaintiff argues that he sometimes only received three hours of yard time in four weeks. (*Id.* at 9.) During this time, HDSP was also in the process of constructing new outdoor cages, which prevented inmates from being able to access the yard. (*Id.*) Like disciplinary segregation, he was also not permitted in-person access to the law library, education opportunities, or the chapel. (ECF Nos. 10 at 7; 111 at 27; 111-3 at 21-23.)

Plaintiff was placed in SMU status for approximately seven months, from June 10, 2022, until January 24, 2023. (ECF No. 101 at 3.) A deprivation of privileges for seven months creates a genuine dispute of material fact as to whether Plaintiff suffered an atypical and significant hardship. *See Chappell v. Mandeville*, 706 F.3d 1052, 1064 (9th Cir. 2013) (hardship is measured on a "case

24

by case, fact by fact consideration"); *Burns*, 2020 WL 3549845, at *5 (segregation-like confinement for 110 days sufficient); *Augborne*, 2022 WL 3159322, at *3 (three to eight months sufficient). While neither party put forth facts indicating that Defendants' actions will affect the duration of his sentence, a reasonable jury could find that the conditions and length of Plaintiff's confinement impacted his liberty interest.

### 2. Process Due

Having found that Plaintiff has a liberty interest in remaining in the Level 2 protective housing unit, the Court then turns to whether he was afforded appropriate process. The Supreme Court has held that an informal, nonadversary evidentiary review within a reasonable time after his confinement is sufficient to justify a decision to confine an inmate to segregation conditions pending the completion of a disciplinary process. *See Hewitt v. Helms*, 459 U.S. 460, 476 (1983) *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 473 (1995). Prison officials must also engage in some periodic review of the confinement. *Id.* at 477 n.9. The Court focuses on whether the Defendants' delay of Plaintiff's disciplinary hearings while in SMU deprived him of his rights to procedural due process.

### a. Whether In-Absentia Classification Hearing Violated Due Process

Plaintiff argues that because the classification hearing placing him in SMU was conducted without him present, his rights to due process were violated by Defendant Johnson for failing to properly oversee the administration of the classification system.

The Supreme Court has held that "confining respondent to administrative segregation pending completion of the investigation of the disciplinary charges against him is not based on an inquiry requiring any elaborate procedural safeguards." *Hewitt v. Helms*, 459 U.S. 460, 475 (1983). "[A]n informal,

25

nonadversary evidentiary review sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Id.* at 476.

Plaintiff was afforded this process before he was placed in SMU. Although he was not at the June 10, 2022, classification hearing that initially placed him in SMU, on June 14, 2022, Plaintiff attended a sub-classification committee hearing staffed by Joshua Padilla and Senior Correctional Officer Gantt. (ECF No. 101-6; ECF No. 111-3 at 7.) The hearing reviewed his "disciplinary history, sentence structure, and overall prison adjustment." (*Id.*) The hearing concluded with a determination that the placement in SMU was proper. (ECF No. 101-6 at 4.) The Case Printout Report states that Plaintiff was present, and that "inmate denied any concerns housing PSU/SMU." (ECF No. 111-3 at 7.)

Plaintiff disputes that this review could have changed the outcome of ending up in SMU. (ECF No. 111 at 17.) That qualification, however, is not the level of process that is owed before placing an inmate in administrative segregation pending the resolution of an investigation. The sub-classification hearing presented Plaintiff with an opportunity to present his views to a prison official. Therefore, summary judgment is granted to Defendant Johnson on due process claims arising out of the initial classification hearing.

### b. Whether Delay of Disciplinary Hearings Prolonged Plaintiff's Stay in SMU

Plaintiff argues that his prolonged placement in SMU was a result of delayed disciplinary hearings that were within the control of the Defendants to schedule and resolve.

Plaintiff was told that his housing and classification in SMU were accurate due to the pending OIC charges against him. Plaintiff initially grieved the violation of his due process on July 14, 2022, for moving him to Unit 3A in SMU without a hearing. (ECF No. 111-3 at 83.) Lieutenant Treadwell denied his grievance on the grounds that "per OP 507A inmates may be housed in SMU pending the outcome of an Offense in Custody. You were moved into SMU housing while pending an MJ2 assault which resulted in a negotiated plea of a G6 fight (institutional violence). . . At this time you are still pending a MJ25 threats and [your risk factor score] calculates at 11." (ECF No. 111-3 at 82.) Therefore, because Plaintiff's pending OIC charges from February 2022 had not been resolved, his risk score remained above the threshold to stay in SMU five months later.

Despite being charged in February 2022, the hearings on Plaintiff's OIC charges were delayed for months. Plaintiff received a hearing on his charges regarding possession of contraband (OIC 505741) and his altercation (OIC 505789) before Defendant Moreda on August 7, 2022. (ECF Nos. 101-7, 101-8.) Both hearings were again delayed to determine the availability of additional evidence and witnesses. (*Id*; ECF No. 111-4 at 48, 51.) It is unclear when Plaintiff had a hearing on the fight (OIC 505729), but it resulted in a plea agreement for a general infraction, not a major infraction, before August 23, 2022. (ECF No. 111-3 at 82.)

Defendants Barth and Moreda were aware that failing to resolve Plaintiff's remaining charges was holding up his transfer to NNCC, and by extension, prolonging his stay in SMU. On September 29, 2022, Defendant Barth and Plaintiff attended full classification committee hearing, discussing Plaintiff's transfer to NNCC per a settlement agreement. (ECF No. 111-3 at 7.) On November 13, 2022, Plaintiff kited Defendant Barth requesting the completion of his disciplinary hearings to resolve his charges regarding the possession of

contraband (OIC 505741) and his altercation with staff (OIC 505729) and because it was "the reason NNCC has not responded to my transfer, which you were at full class on 9-29-22." (ECF No. 111-4 at 42.) On November 16, 2022, Plaintiff kited Defendant Moreda requesting the same thing, also letting him know that he was "waiting on OMD" so that he could get his transport to NNCC. (ECF No. 111-4 at 44.)

Once he was able to get a hearing, the charges against him were quickly resolved. A hearing was held on his contraband charge (OIC 505741) November 17, 2022. (ECF No. 111-4 at 48.) Plaintiff was ultimately found not guilty on November 29, 2022, for lack of available evidence. (*Id.*) A hearing was held regarding his altercation with staff (OIC 505729) on November 17, 2022, and Plaintiff was ultimately found not guilty on November 24, 2022. (*Id.*)

As a result of resolving his charges, Plaintiff was finally cleared to transfer to NNCC or LCC on January 19, 2023, after Plaintiff attended a final full classification hearing at HDSP. (ECF No. 111-3 at 7; ECF No. 101-5 at 4.) In total, Plaintiff spent more than six months housed in SMU as a result of waiting nearly nine months to receive any hearing on his pending OICs. (ECF No. 10 at 5.)

### c. Process Due

Plaintiff argues that this failure to provide him a timely disciplinary hearing violated his rights to procedural due process.

An inmate subject to a prison disciplinary hearing is entitled to certain procedural protections: (1) written notice of the charges against him; (2) at least 24 hours between delivery of the written notice and his disciplinary hearing; (3) a written statement by a factfinder as to the evidence relied upon and the reasons for disciplinary action; and (4) an opportunity to call witnesses and present documentary evidence in his defense when allowing him to do so "will not be unduly hazardous to institutional safety or correctional goals." *Wolff v. McDonnell*, 418 U.S. 539, 563–66 (1974).

Although *Wolff* does not explicitly address the issue timing of disciplinary hearings, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. *Hewitt*, 459 U.S. at 477 n.9. Prison officials must periodically review the initial placement. *Id.* "The decision to continue confinement of an inmate pending investigation of misconduct charges depends on circumstances that prison officials will be well aware of – most typically, the progress of the investigation." *Id.* A review of an inmate's status every 120 days has been found to satisfy due process requirements. *Touissant v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990).

Plaintiff's status in SMU entitled him to at least a 120-day periodic review of his placement under *Hewitt*. Because Plaintiff was placed in SMU on June 10, 2022, and received an initial hearing on his disciplinary charges on August 7, 2022, he received a review of his SMU status within 60 days. Therefore, the named Defendants did not violate his rights to due process, and summary judgment is granted for Defendants.

**Spoliation**

Plaintiff's Opposition claims that the Defendants engaged in spoliation of evidence for several of his claims. (ECF No. 111 at 19-20, 23.) Specifically, he alleges Defendants conspired to "cover up bad actors" by claiming that he did not file kites when he allegedly did. (*Id.* at 23.) This includes kites for medical requests, a kite for a disciplinary hearing, and a kite regarding his transfer to SMU. (ECF No. 111 at 20.) Plaintiff did not move for spoliation nor present evidence support his claim. Therefore, the Court cannot make a finding of spoliation at this time.

### a.  Motion to Seal

Alongside their Motion for Summary Judgment, Defendants filed a Motion for Leave to File Plaintiff's Records Under Seal. (ECF No. 102.) Plaintiff filed an opposition to his "legal documents and medical documents being sealed for any

29

reason whatsoever – especially discovery, submitted as exhibits." (ECF No. 106.) He cites to law referring to the discovery process, and the concealment of documents to the Court. (*Id.*) Plaintiff appears to misunderstand the purpose of a motion to seal, which does not hide information from Plaintiff or the Court but protects Plaintiff's medical records from public viewing. Plaintiff does conclude, however, that he "waive[s] all confidentiality of [his] medical files" and "cares nothing about medical privacy." (*Id.*)

"The courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 591 (9th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018)). Certain documents are exceptions to this right and are generally kept secret for policy reasons, including grand jury transcripts and warrant materials in a pre-indictment investigation. *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006).

If a party seeks to file a document under seal, there are two possible standards the party must address: the compelling reasons standard or the good cause standard. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016). The choice between the two standards depends on whether the documents proposed for sealing accompany a motion that is "more than tangentially related" to the merits of the case. *Id.* at 1099. If it is more than tangentially related, the compelling reasons standard applies. If not, the good cause standard applies. *Ctr. for Auto Safety*, 809 F.3d at 1102.

Here, Defendants seek to file exhibits under seal in connection with the motion for summary judgment, which is "more than tangentially related" to the merits of a case. Therefore, the compelling reasons standard applies.

Under the compelling reasons standard, "a court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling,

without relying on hypothesis or conjecture.'" *United States v. Carpenter*, 923 F.3d 1172, 1179 (9th Cir. 2019) (quoting *Ctr. for Auto Safety*, 809 F.3d at 1096-97) (alteration in original). Finding a compelling reason is "best left to the sound discretion" of the Court. *Ctr. for Auto Safety*, 809 F.3d at 1097 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978)).

This Court, and others within the Ninth Circuit, have recognized that the need to protect medical privacy qualifies as a "compelling reason" for sealing records, since medical records contain sensitive and private information about a person's health. *See, e.g., Spahr v. Med. Dir. Ely State Prison*, No. 3:19-CV-0267-MMD-CLB, 2020 WL 137459, at *2 (D. Nev. Jan. 10, 2020); *Sapp v. Ada Cnty. Med. Dep't*, No. 1:15-CV-00594-BLW, 2018 WL 3613978, at *6 (D. Idaho July 27, 2018); *Karpenski v. Am. Gen. Life Companies, LLC*, No. 2:12-CV-01569RSM, 2013 WL 5588312, at *1 (W.D. Wash. Oct. 9, 2013). While certain aspects of a party's medical condition may be at issue in certain types of actions, that does not mean that all medical records filed in connection with a motion (which often contain unrelated medical information) must be broadcast to the public. In other words, the party's interest in keeping sensitive health information confidential outweighs the public's need for direct access to the medical records.

Here, the referenced exhibit contains Plaintiff's sensitive health information, medical history, and treatment records. Balancing the need for the public's access to information regarding Plaintiff's medical history, treatment, and condition against the need to maintain the confidentiality of these medical records weighs in favor of sealing these exhibits. Therefore, Defendants' motion to seal, (ECF No. 102) is granted.

### 1. Conclusion

It is therefore ordered that Defendants' Motion for Summary Judgment (ECF No. 101) is GRANTED.

31

It is further ordered that Defendants' Motion for Leave to File Excess Pages (ECF No. 100) is GRANTED.

It is further ordered that Defendants' Motion for Leave to File Plaintiff's Records Under Seal (ECF No. 102) is GRANTED.

The Clerk of the Court is directed to enter judgment in favor of Defendants and close this case.

Dated this 31st day of March, 2026.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

32